No. 83.—PHILIP A. CLAYTON, plaintiff in error, *vs.* ARTEME-
SIA W. TUCKER, executrix of N. S. Tucker, deceased, de-
fendant in error.

[1.] A B covenanted with a mother and her two children to stand seized
of certain slaves to their use.  Afterwards, the mother married a second
husband and survived him.  After his death, she was sued as his execu-
tor of her own wrong, in respect to these slaves.  On the trial, the plaintiff
offered evidence to prove that A B was insolvent when he made the cove-
nant: *Held*, that the evidence was not admissible.

[2.] The Court refused to let the plaintiff prove that the second husband was
insolvent before the date of this deed: *Held*, that the Court did right.

[3.] Declarations which accompany an act, and which are such as may well
explain the act and be a part of it, are admissible as evidence along with
the act.

[4.] If a debtor in failing circumstances, with a view to defraud his creditors,
procure a conveyance of property to his wife and her children, by supply-
ing the consideration for the conveyance, or the property conveyed, and his
wife, through her trustee, take possession of the property under the con-
veyance, and keep such possession till the death of the debtor and after-
wards, she becomes, on his death, executor in her own wrong, as to the
creditors.

Assumpsit, in Bibb Superior Court.  Tried before Judge
POWERS, May Term, 1856.

This was an action brought by the plaintiff in error against
the defendant in error, as the executrix *de son tort* of Nathan
S. Tucker, deceased.  The case came on for trial on the ap-
peal in the Court below, when the following evidence was
submitted to the Jury by plaintiff:

WILLIAM HOLMES testified, that he knew Nathan S.
Tucker when in life; Tucker lived in a brick house on or
near court-house square for fifteen years or more, and died
four or five years ago; his widow and children still reside at
the same place; there is also a two story wooden building on
same lot; the lots and houses are worth two thousand dollars
or more, and are in possession of defendant; don'nt know of
any acts of ownership that Mrs. Tucker has exercised over

the wooden building and none as to the other, except that she resides in it and has resided in it ever since the death of Nathan S. Tucker.

ALBERT ROSS being sworn, stated the same facts testified to by the witness, Holmes, and also stated that there were negroes at Tucker's in his lifetime—a woman and her daughter, and perhaps more, which negroes he had seen at the house since Tucker's death; cannot say as to what acts of ownership Mrs. Tucker ever exercised over the houses and negroes, if any.

GREEN J. BLAKE testified, that he had a negro named Rial who had a wife at Mrs. Tucker's, and Rial was sick and witness frequently visited him; a negro woman that Mrs. Tucker claimed and exercised such acts of ownership over as masters usually do over their slaves, named Biddy, wife of Rial, was frequently in the kitchen where witness' boy was, and Mrs. Tucker was often in the kitchen when witness was there; Biddy was worth $400 or $500; there was also another woman about the place controlled by Mrs. Tucker, named Dianna, I believe, worth $1000, and one or more negroes about, can't be certain; the two negro women were worth, for hire, $160 per annum; witness became acquainted with Tucker in 1842; Tucker then resided in the brick house, and continued to reside there until his death; does not know that Mrs. Tucker ever hired out the negroes or rented the houses; does not know of any acts of ownership only as above stated.

JAMES DEAN testified as follows: I bought the negro Dianna for Mrs. Tucker; I took the following bill of sale:

"GEORGIA, BIBB COUNTY:

Received, Macon, January 1st, 1851, from Mr. James Dean, for Mrs. Artemesia W. Tucker, eight hundred dollars for a certain brown girl, Dianna, about twenty-five years old; warranted a slave for life, against the claim of myself and heirs and all other persons whatsoever.

(Signed)　　　S. D. MELVILLE."

The money to pay for the negro was given to me by one of the boys, son of defendant, or by Tucker. Mrs. Tucker told me, before and after, that she sent me the money.

Cross-examined: Tucker sometimes had money, and when he went crazy, thought himself rich; he used money that belonged to me and bought a lot of horses which I took; I believed the money he paid for them was mine; Mrs. Tucker never had anything to do with them.

ADOLPHUS TUCKER testified, that Mrs. Tucker lives in the house in which Nathan Tucker lived at the time of his death, and has lived there ever since.

Cross-examined: The titles to said lots is in William Atkins, trustee for Mrs. Tucker; William Atkins lived there with his mother, controlled and managed the property, rented it out in his own name and received pay therefor; Mrs Tucker exercised no control over any of the property only by permission of her trustee.

GEORGE W. ADAMS testified, that he, in behalf of the rail road company, called with others on Mrs. Tucker to purchase part of lot No. 1, in square No. 16, in the City of Macon; she went over the ground and agreed with witness as to the line, selling 50 feet by 210 feet off said lot No. 1; the company paid $760 or $780; Mrs. Tucker seemed to be owner; gave directions about the sale and the quantity to be sold, and was consulted as owner; the fifty feet was something less than half the lot; she remained in possession of the balance of the lot and is still in possession; does not know to whom the money was paid, or by whom the deed was made.

Plaintiff then introduced a map of the city showing that lots 1 and 2, in square 16, lie adjoining each other, and near court-house square.

JOHN SPRINGER testified, that he was Sheriff of Bibb County in 1839 and 1840; whilst Sheriff, and before, he was frequently at Nathan S. Tucker's house; saw several negroes there; cannot recollect their names; has seen the same negroes at the same place since Tucker's death; is certain the negroes are the same, some of them certainly; there may be

more; Tucker lived in the house 15 or 20 years; Tucker was considered insolvent from 1839 'til his death; very much involved in debt; both lots were in possession of Tucker, and both sold as his property by witness to Rose & Thomson; does not know who has controlled the property since Tucker's death or since 1846.

Plaintiff introduced a *fi. fa.* in favor of William B. Cone against Nathan S. Tucker for $500, besides interest, on which there was a return of "no property," dated December 31st, 1836.

Plaintiff also offered to introduce as evidence, to show the indebtedness of said Tucker, the two notes sued on, amounting to $1000 besides interest, and dated January 1st, 1837; which testimony was repelled by the Court.

THOMAS A. BROWN testified, in answer to interrogatories, as follows: Nathan S. Tucker, during his life, owned two lots in the City of Macon, one of which fronted on court-house square, on which were a two story brick house and a two story wooden house; the brick house he occupied a number of years and at the time of his death; witness does not know from whom Tucker purchased the property; said property was sold at Sheriff's sale some 12 or 15 years ago as the property of said N. S. Tucker, and bid off by A. E. Thompson and Albert Rose at a price which witness does not now remember; and sometime since, as near as witness can remember, in 1845, was sold again at Sheriff's sale as the property of said Thompson and Rose; at which sale witness, at the instance of Thompson and Rose and N. S. Tucker, bid off said property at the price of about $450 for the benefit of said Tucker, Thompson and Rose agreeing with said Tucker that the said sum of about $450 was the money due them from said Tucker for what they had advanced for the purchase of said property at the first Sheriff's sale; which fact was so announced by Col. Henry G. Lamar, Counsel for plaintiffs in execution, at the sale, when witness bid said sum of about $450 and the property was knocked off to him without another bid, the said N. S. Tucker agreeing to fur-

nish witness with funds to pay said purchase money; sometime after the sale, witness, at the request of Tucker, requested the Sheriff to transfer his bid to William Atkins, the son of Mrs. Tucker, and make him or any other person a title to the property, upon their paying the amount of the purchase money; witness does not know to whom the title was made, nor by whom the money was paid; witness does not know that the property was N. S. Tucker's at the time of his death.

Cross-examined: Witness does not know, of his own knowledge, who has the title to said lot now, or who has had it since 1845 or for the last 8 or 9 years.

———— HARRIS testified, that he rented the two story wooden house on lot No. 2 from Mrs. Tucker in the year 1853, but gave his notes to her trustee and paid the money to him; the notes were so made payable at her request after the contract of renting took place, and witness paid the money to her.

Plaintiff closed, and the following testimony was introduced by defendant:

W. J. McELROY testified, that he rented the wooden building and lot attached thereto in 1848 or 1849 from Mrs. Tucker; paid the notes to the trustee, Atkins, to whom they were made payable.

Several receipts for rent were then introduced, all signed by Atkins, trustee for Mrs. Tucker. Plaintiff objected to this evidence, but the objection was over-ruled.

Defendant then introduced a deed to lot 2, square 16, to William Atkins, trustee for defendant, made by James Gates, Sheriff; consideration, $455, and dated October 7th, 1845.

JAMES M. BIVINS testified, that on the 6th of January, 1846, he and William Atkins were clerks in the house of Hardeman & Hamilton; Atkins told witness he wanted to buy the place for his mother, and inquired of witness the probability of getting the money from Hardeman & Hamilton; witness told him to try; he made the application; it was favorably received, and by direction of said firm, witness

handed him $500 January 6th, 1846, and charged it to him on their books.    (Plaintiff objected to the sayings of Atkins.)

ALBERT ROSE testified, that he never got back the money he advanced for the purchase of Tucker's property; Tucker never paid any part of the money to witness or to Thompson, as witness believes; does not know whether he paid Thompson his part or not; Tucker was low down and poor for ten years; had money sometimes, not much; witness never pushed him about it.

A. R. FREEMAN testified as follows: I am Clerk and Treasurer of the City Council of Macon; the trustee for Mrs. Tucker has given in and paid taxes for lots 1 and 2, square 16, since 1846 or about that time; the trustee controlled the property.

Plaintiff objected to Freeman's testimony, but was overruled.

THOS. HARDEMAN testified, that William Atkins applied to him for $500 to buy, as Atkins told witness, the house and lots referred to for his mother; witness let him have the money; it has been paid back to witness either in wages or money, or in some other way; witness does not now recollect.

(Plaintiff objected to the sayings of Atkins.)

Defendant then introduced a deed to lot 1, in square 16, dated May 22d, 1839, from Sheriff Springer to Thompson and Rose; also, a quit claim deed from Thompson and Rose, dated March 3d, 1851, to Baber L. Atkins, trustee for Mrs. Tucker; consideration, $5 00.

Defendant introduced an instrument made by Ambrose Baber, of which the following is a copy:

"This indenture witnesseth that I, Ambrose Baber, for divers, various and valuable considerations unto me, moving from Artemesia W. Atkins, Elvina A. Tucker Atkins, Rodolphus S. Tucker Atkins, hath covenanted with the parties of the second part that I will stand and continue seized of the following property to-wit: Annika, a woman about 22

years old, her two children, Sarah, a girl about three years old, and Margianna, a child one year old, for the uses, purposes, &c. hereinafter named, to-wit: for the exclusive use and enjoyment of Mrs. Artemesia Atkins during her natural life, and the avails, income and annual profit to be subject to her order alone; and after her death, said negro property to be held by me for the joint use, benefit and behoof of the said Elvina and Rodolphus and their heirs, to be equally divided between them. And I do hereby covenant with the parties of the second part, that I will forthwith deliver to them the possession of said negro property and its increase, the use whereof is to be applied in manner above specified, with this condition: that should any claim be set up adverse to Mrs. Adkins and urged, the possession of said property is to be reclaimed by me. And should either of the parties of the second part die during the lifetime of either of the others, the distributive share of the same is to go and be vested in the survivors. In the event of the death of Mrs. Atkins, the other parties surviving, the use of said property is to go to and be vested in the appointed guardian of said children until the arrival at lawful age of said Rodolphus or marriage of said Elvina. In either event the property is to be equally divided between them. And should I die during the lifetime of Mrs. Atkins, I ordain that application be made to the Superior Court of Bibb County to appoint a trustee in whom the title of said property is to be vested during the life of Mrs. Atkins, giving to her the use of the same during that time; and after her death, the same to go and be vested in the other parties of the second part, to be equally divided between them. And I do hereby reserve to myself the right of reclaiming said property, should an adverse claim arise during her lifetime interest in its use, and should there be any mismanagement during that time, the same likewise to revert to me for the benefit of the other heirs herein specified, or to an appointed trustee after my death.

(Signed,)            AMBROSE BABER." [L. s.].
This instrument bears date July 3d, 1839.

ADOLPHUS TUCKER, introduced by defendant, testified that the negro woman Biddy is 60 years old and valueless; not worth her support. Annika is not the daughter of Biddy; all the negroes are in the possession and under the control of the trustee of Mrs. Tucker, who is the mother of witness. Both the lots are controlled by the trustee. William Atkins died in California in December, 1850. N. S. Tucker died March 12th, 1851. William Atkins continued to act as trustee for Mrs. Tucker until his death. Baber L. Atkins was appointed trustee in April, 1854, and is now acting as trustee. Mrs. Tucker has never used nor controlled any of the property except under the direction of her trustee. Both lots were claimed as trust property and controlled by the trustee.

JAMES ARNOLD testified, that his father rented a part of the property in question during the years 1846–7 and 1848, from William Atkins, and paid him the rent.

The proceedings showing the appointment of Baber Atkins as trustee in 1852, were then read. A number of tax receipts were read to the Jury, signed by the Tax Collector of the county and the City Treasurer, showing that William Atkins, as trustee for Mrs. Tucker, paid taxes for several years previous to 1851.

The evidence here closed, and the Jury returned a verdict for defendant; whereupon, plaintiff moved for a new trial on the following grounds:

1st. Because the Court refused to permit plaintiff to prove the insolvency of A. Baber in 1839, at the time of the pretended gift of the negroes in the deed made by him.

2d. Because the Court refused to permit plaintiff to introduce as evidence to prove N. S. Tucker's indebtedness, the two notes sued on, dated January 1st, 1837.

3d. Because the Court erred in permitting defendant to prove by Hardeman & Bivins the sayings of William Atkins, at the time of the loan by Hardeman to Atkins.

4th. The Court erred in admitting the tax receipts, and in admitting the testimony of A. R. Freeman.

5th. The Court erred in ruling that Baber's deed did not show that he claimed title to the negroes; that his agreeing thus to stand seized was consistent with the fact that some other person, as trustee for Mrs. Tucker, may have paid for the negroes.

6th. The Court erred in charging the Jury, that on the death of a man, his widow has a right to live in the house and to use it, and all the servants, just as she did before; and that this did not make her executrix *de son tort*—the Court putting no limit to this privilege so charged, unless she sold them.

7th. Because the Court refused to charge as requested, "that if the Jury believe, from the evidence, that the deeds and other instruments under which defendant claims the real and personal estate, or either of them, were made when N. S. Tucker was embarrassed with debt, and were made to defraud creditors, such instrument or instruments are void; and if defendant has intermeddled with the property so attempted to be conveyed, since Tucker's death, such as using it as her own, renting a house not her own, or selling the property or a part of it, then such acts make her executrix in her own wrong, and you will find in favor of the plaintiff." The Court, on the contrary, charged, that "if defendant has a colorable title to the property in question, she is not liable in this form of action; that the plaintiff could bring trover and ejectment; that a colorable title is a complete answer to the plaintiff in this form of action; otherwise, persons would be deterred from asserting their rights in a case where their titles were doubtful or defective."

8th. Because the Court erred in refusing to charge as requested, "that if the Jury believe that the sum of $455, or about that sum, the amount of the sale by the Sheriff of lot 2 in square 16, was all that was due from Tucker to Rose & Thompson on the purchase of the Tucker property in 1845, only that sum ($455) was unpaid, i. e. unrefunded to them by Tucker, at the time of the Sheriff's sale in 1845, and that lot 2 in square 16 sold for that sum, *then*, by operation of

law, lot No. 1 vested in N. S. Tucker and became subject to his debts; and if the widow has sold a part of it since his death, and is in possession of the balance, using it as her own, such acts make her executrix *de son tort*, and you will find in favor of plaintiff." The Court, on the contrary, charged, "that if defendant had a colorable title, it was a protection to her in this form of action, and the plaintiff must seek his remedy in some other way."

9th. Because the Court erred in refusing to charge as requested, "that if the Jury believe the conveyances, or any of them, were fraudulent or made to defraud or delay creditors, and that defendant was a party to it, then such conveyances are void, and you will find in favor of plaintiff."

10th. Because the Court erred in refusing to charge as requested, "that if Mrs. Tucker was *particeps* in any fraud as to conveyances, then the rule of law insisted on by defendant as to colorable title, did not apply." The Court refused to give this request in charge, on the ground that there was no evidence to warrant it.

The Court refused to grant a new trial, and Counsel for plaintiff excepted and assign the same as error.

STUBBS & HILL; J. RUTHERFORD, for plaintiff in error.

C. B. COLE; GEO. R. HUNTER, for defendant.

*By the Court.*—BENNING, J. delivering the opinion.

Ought the Court to have granted the motion for a new trial?

The plaintiff's case was such, that it became necessary for him to show that the lots of land and the negroes to which the testimony relates, belonged to the estate of Nathan S. Tucker, deceased, and that the defendant had, since Tucker's death, as executrix of her own wrong, intermeddled with them. Every question in the case grows out of his endeavor

to establish these two points. It is in reference to them, therefore, that every question has to be considered.

And the case is also such, that the plaintiff, in making out these two points, was not entitled to refer to the Statute of the 13*th Elizabeth*, that annuls deeds made by debtors to defraud creditors, for none of the deeds in the case were made by the *debtor.* Not one of those deeds was made by N. S. Tucker. These deeds, if in the plaintiff's way, he had to overcome by showing that the consideration on which they were founded, or the property which they conveyed, was supplied by N. S. Tucker.

The first ground of the motion for a new trial, was the refusal of the Court " to permit the plaintiff to prove the insolvency of A. Baber in 1839, at the pretended gift of the negroes in the deed made by him."

The deed referred to, is a deed made by A. Baber, which contains a covenant of his to stand seized of certain slaves to the use of Artemesia W. Atkins, Elvina A. Tucker Atkins, and Rodolphus S. Tucker Atkins. And these are the parties of the second part to the deed. The deed was made in 1839.

When the deed was made, then, Artemesia W. *Atkins* had not become the wife of N. S. *Tucker.* This is the inference, and there is nothing to rebut it in the evidence.

But unless she was Tucker's wife at the time when the deed was made, there can be no room for the presumption that *he* furnished the consideration for the deed.

Of what consequence, therefore, can it be in the case, whether Baber was insolvent or not at the time when he made the deed.

Besides, the deed is for the benefit of others besides Artemesia W. Atkins. It is for the benefit of two of her children as well as for her benefit; and it is not to be presumed that Tucker, even if the mother was his wife, supplied the consideration that caused the deed to be in part for the benefit of the children. They were not his children.

And, indeed, to say that the mere insolvency of a person

who covenants to stand seized of property to the use of a wife, is evidence that the husband some how furnishes either the consideration or the property, is to go some distance for a conclusion.

[1.] This was not a sufficient ground, as we think.

The next ground of the motion, was the refusal of the Court " to permit plaintiff to introduce, as evidence to prove N. S. Tucker's indebtness, the two notes sued on."

We suppose that by " *indebtedness*," is meant insolvency.

[2.] Concede, then, that Tucker was insolvent in 1837, is any thing to be inferred from that, to the effect that he furnished the consideration or the property, for deeds that were made afterwards? Certainly not. Be it remembered, that none of the deeds were made by him. If he was insolvent, the presumption is that he was not able to make a gift.

We see nothing, then, in this ground.

The third ground of the motion, was the permission to the defendant to prove by Hardeman and Bivins the sayings of William Atkins, at the time of the loan made by Hardeman to him.

[3.] It was clearly the right of the defendant to prove the *fact* of the loan. If so, it was, as a consequence, also her right to prove any declarations made by Atkins, which accompanied that fact, and which were suitable to explain the fact or to be a part of the fact. (*Ph. Ev.* 231, *Cow.* & *Hill's Note, No.* 444.)

And such were the declarations of Atkins, testified to by Bivins and Hardeman.

And the same may be said of the *acts* of Atkins, consisting in the payment of the taxes on the property while he " controlled" it. They were acts, naturally, if not necessarily, accompanying the control of the property.

The fifth ground is one which this Court is not sure it understands. If the "ruling" excepted to was, that Baber's agreeing to stand seized of the slaves for the use of Mrs. Atkins and her two children, was consistent with the fact, that some other person *than N. S. Tucker* might have furnished

the consideration to Baber for such agreement, or with the fact that some other person *than N. S. Tucker* might have supplied the slaves of which Baber agreed to so stand seized, we can see nothing wrong in the ruling. At the time of this covenant of Baber's, Mrs. Atkins, as it seems, had not become the wife of Tucker. What reason, then, was there for his concerning himself with the covenant to the extent of being the main party in it—the party supplying the consideration or the property? We see none.

In respect to the sixth ground, we agree with the plaintiff's Counsel, that there is a limit to the widow's privilege of using the house and servants of her deceased husband, short of that mentioned by the Court. The Court, we infer, said that the widow could not sell the house and servants of the deceased husband, without becoming executrix of her own wrong, and there stopped. If the Court meant that she could do every thing else with them without becoming such executrix, we differ with the Court. But we suppose the Court meant nothing of that sort, but merely meant to give an instance of what would make a widow an executrix in her own wrong.

The seventh ground is the important one. It is made up of a charge and a refusal to charge.

We understand the decision of the Court complained of in this ground to amount to this: that Mrs. Tucker, by virtue of the several deeds, had at least a color of title to the property with which she intermeddled, and that having a color of title to the property, to intermeddle with it would not make her executrix of her own wrong, even if the property really belonged to the estate of Tucker, as far as his creditor, Clayton, was concerned.

Was a decision amounting to this right?

Let us suppose these to have been the facts of the case, viz: N. S. Tucker, a man in failing circumstances, at a time when he owed two notes to Clayton, furnished the money that was the consideration for the several deeds, or supplied the property that was conveyed by the deeds, and did so with

the design to defraud Clayton out of the money due on the notes. The property went, under the deeds, into the use and possession of Mrs. Tucker, and remained so until Tucker's death; and afterwards, until the commencement of this suit.

And according to what it is likely was the plaintiff's view of the evidence, these were the facts of the case.

Supposing, then, these to have been the facts of the case, the case was such that, in law, the property belonged to Mrs. Tucker (and the children) as against Tucker, but not as against Clayton. The property was still subject to the payment of Clayton's debt. With that exception, it was entirely Mrs. Tucker's.

This legal consequence will hardly be disputed.

The sole question then, in such a case, with Clayton, would be how to get at the property. And the question would be one of difficulty. His debt not being in the form of a judgment, he could not make a *levy* on the property. If there was a regular administrator of Tucker, and he sued him and got a judgment for his debt, the judgment would have to be one of assets "*quando*," &c. for that administrator would not have possession of the property or the right to get possession of it. The deeds having been good against Tucker, his intestate, would be good against him, he being only Tucker's representative. If there was no regular administrator, and he administered, himself, with a view to retain assets for his debt, he would find himself without any assets to retain, and without the means of obtaining any. The deeds would be good against him; and so, would prevent him from obtaining the property that they covered. If he sued Mrs. Tucker as executrix of her own wrong, he would be met by the answer, that she held the property as her own by a title adverse to that of the intestate and good against the intestate; and therefore, that she did not hold it as his executrix. Take what path he might, he would find across it an obstacle to be surmounted. What path ought he to take? The decisions

seem to point him to this last path as the one containing the obstacle most easily to be surmounted.

This we think to be the indication of *Hawes vs. Leader*, (*Cro. Jac.* 271,) and *Edwards vs. Harben*, (2 *T. R.* 587;) and see 1 *Wms. Ex'rs*, 151; *Roberts on Fraud. Conv.* 593.)

If the case had been that of a deed made by Tucker, and made to defraud his creditors, with possession taken by the donee after Tucker's death, the donee, these cases decide, would have been executor *de son tort*. And what difference is there, in principle, between such a case as that and the case as it is? None.

It is true that, in general, one who intermeddles under a color of title in himself, is protected from being chargeable as executor of his own wrong. But this cannot be true as a universal rule. Such cases as those of *Hawes vs. Leader* and *Edwards vs. Harben*, must be regarded as exceptions to the rule; and by analogy to those cases, so must the present case. See *Crosby vs. DeGraffenreid*, decided at Macon, January, 1856; *Matthews vs. Allen*, (7 *Ga. R.*); *Trippe & Slade vs. McGhee*, (2 *Kelly.*)

This decision of the Court, then, seems to us to have been wrong.

We think that if the considerations for the deeds were furnished by Tucker, or if the property conveyed by the deeds was supplied by him, and he being in failing circumstances, procured the deeds to be made in order to defraud Clayton, and Mrs. Tucker took possession of the property to hold it under the deeds, she became executrix of her own wrong as to Clayton; and that this is what the Court should have charged.

This disposition of this point, is a disposition of the next two grounds of the motion, the eighth and ninth.

As to the tenth and last ground, we agree with the Court below. We see no evidence that Mrs. Tucker participated in any fraud, if any fraud was proved.

One of the grounds then, and only one, in the opinion of this Court, was sufficient.